

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PATRICK ANTHONY BIANGAMANO,          )
                                     )
                Plaintiff,           )
                                     )
        v.                           )    Case No. 10 CV 7122
                                     )
MICHAEL J. ASTRUE,                   )    MAGISTRATE JUDGE
Commissioner of Social Security,     )     ARLANDER KEYS
                                     )
                Defendant.           )

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff, Patrick Anthony Biangamano ("Mr. Biangamano" or "Plaintiff"), moves this court for summary judgment, pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, to reverse or remand the final decision of the Commissioner of Social Security (the "Commissioner"), who denied his claim for Disability Insurance Benefits. In response, Defendant Commissioner asks the Court to deny Mr. Biangamano's motion and affirm the decision of the Commissioner. For the reasons set forth below, the plaintiff's motion for summary judgment is DENIED, and the decision of the Commissioner is AFFIRMED.

## PROCEDURAL HISTORY

On December 13, 2007, Mr. Biangamano applied for Social Security Disability Insurance Benefits ("DIB"), alleging a disability beginning on September 1, 2006 after suffering an injury from falling off a ladder in August 2006. (R. at 44, 126-27.) Mr. Biangamano's claim was denied on March 4, 2008. (R. at 81-85.) After retaining an attorney, on March 7, 2008, Mr. Biangamano requested reconsideration of the denied claim. (R. at

86-88; 89; 92-93.) The Social Security Administration ("SSA") had the claim independently reviewed by a physician and disability examiner and determined that the denial was proper under the law. (R. at 89.)

On June 5, 2008, Mr. Biangamano filed a written request for a hearing before an Administrative Law Judge. (R. at 94.) A hearing was held on August 11, 2009 before ALJ Jose Anglada. (R. at 36.) The ALJ issued an unfavorable decision on September 23, 2009, finding that Mr. Biangamano was not disabled under sections 216(i) and 223(d) of the Social Security Act. (R. at 19-31.) Mr. Biangamano filed a request for review of the ALJ's decision with the Social Security Administration's Appeals Council on November 3, 2009. (R. at 8-12.) The Appeals Council denied the request for review, making the ALJ's September 23, 2009 decision the final administrative determination of the Commissioner. (R. at 1-3.)

On November 4, 2010, Mr. Biangamano filed a complaint in the United States District Court for the Northern District of Illinois, seeking review of the Commissioner's determination. [1] The parties consented to proceed before a United States Magistrate Judge and the case was re-assigned to this Court on January 12, 2011. [9, 10] The case is currently before the Court on Plaintiff's motions for summary judgment.

**I. Hearing of August 11, 2009**

At the hearing, on August 11, 2009, the ALJ heard testimony from Mr. Biangamano, and Mr. Biangamano's fiancé, Sabrina Cote, regarding his level of daily functioning, and from a Vocational Expert regarding Mr. Biangamano's ability to work in today's national economy. (R. at 38-78.)

**A. Mr. Biangamano's Testimony**

Mr. Biangamano testified that he was born on August 2, 1964, and was 45 years old. (R. at 39.) He testified that he has a fiancé, and has two children from a prior marriage, ages twenty and thirteen. (R. at 40, 47.) He testified that he lives alone and does his own laundry, but his fiancé makes his meals and cleans his home. (R. at 47.) He testified that he graduated from high school, has a drivers license and a car, and at the time of the hearing did not have a source of income, but had applied for food stamps. (R. at 39-40, 49.) He explained that he pays for his expenses with help from family and friends. (R. at 47.)

When asked about his employment history, Mr. Biangamano testified that he last worked as a maintenance supervisor for approximately six years. (R. at 41.) He explained that he worked in an apartment complex supervising approximately four employees. *Id.* He testified that he assigned work to his employees, made repairs on the apartments, provided carpentry work, and fixed everything that pertained to the building, such as plumbing and electrical. (R. at 41-42.) Prior to working as a maintenance

supervisor, Mr. Biangamano testified that he had worked for Brower Brothers Steamatic as a carpet cleaner. (R. at 42.) In that position, Mr. Biangamano testified that he performed heavy work, such as moving furniture, in both commercial and residential settings. *Id.* Prior to working for Brower Brothers, Mr. Biangamano testified that he had loaded trucks in a liquor distribution warehouse for approximately five years. (R. at 43.)

Mr. Biangamano also testified that he had micro-laminectomy and spinal fusion surgery in 1992 and 1993 respectively. (R. at 52.) After these surgeries, Mr. Biangamano testified that he received long-term disability, but ultimately returned to work at the apartment complex and was able to perform at full capacity. (R. at 40-41, 52.)

Mr. Biangamano testified that he ultimately stopped working in August 2006 when he fell between six or seven feet off of a ladder from an attic and injured his back. (R. at 44.) He explained that, after his fall, he was rushed to the hospital, as he had no feeling in the lower part of his body. (R. at 44-45.) He further testified, contrary to the Emergency Room records, that he was released from the hospital later that evening. *Id.* Mr. Biangamano also testified that he made a workers' compensation claim, as a result of the fall, that settled for between $12,000 to $15,000. (R. at 45-46.)

After his fall, Mr. Biangamano testified that he did not return to work because his back pain prevented him from performing his job. (R. at 46.) He explained that he could not

stand on his feet or walk for a period of time, nor lift heavy objects such as salt bags, rolls of carpeting, tools, pipes, or appliances. *Id.* Mr. Biangamano also testified that, due to his inability to sit or stand for a short period of time, he did not try performing a job that was lighter in nature, as his pain was too great to hold a job for eight hours per day. (R. at 59.) He explained that, even if he were allowed to receive breaks at work, he would experience pain while sitting and standing. *Id.* He further testified that, had he not fallen off of the ladder, he would still be able to perform his job. (R. at 53.)

Mr. Biangamano testified that he saw three doctors following his fall: Dr. Kornblatt, Dr. Carobene, and Dr. Levine. (R. at 52.) Mr. Biangamano testified that Dr. Kornblatt, his Worker's Compensation doctor, ultimately referred him to Dr. Carobene for pain relief, as his condition did not warrant surgery. (R. at 51-52.) Mr. Biangamano testified that he stopped seeing Dr. Carobene because he "had peaked" in terms of what could be done for him. (R. at 52.) He also testified that his doctors refused to see him after his insurance ran out in 2007, as his condition did not warrant further treatment. (R. at 51-52.)

Mr. Biangamano testified that he feels sore in his back and legs, a throbbing and stabbing pain in his heels, and numbness in his buttocks every day, and some days are worse than others. (R. at 53, 56.) He explained that the pain does not go away during the day, but he does not notice it while he is sleeping. (R. at 56.) He testified that on some days, he wakes up in pain; on

other days, his pain increases as the day goes on. (R. at 53, 56.) He testified that standing on his feet for longer than 20 to 30 minutes is the most difficult thing for him to do during the day, after which he must sit for about a half hour. (R. at 49.) Mr. Biangamano also testified that he experiences pain and weakness in his back and legs when lifting or carrying items over his head. (R. at 60-61.)

When asked to describe his pain on a scale of one to ten, with ten being the worst, Mr. Biangamano rated his current pain at the time of his testimony at a seven, and his normal, every-day pain ranging from a five to a seven. (R. at 57-58.) Mr. Biangamano testified that he manages his pain by taking six hundred milligrams of Extra Strength Tylenol three times per day. (R. at 50, 56.) Mr. Biangamano testified that he spends his days walking and exercising, laying down and resting, and performing hobbies. (R. at 48.) His exercises consist of walking for 20 minutes twice per day, with a six to seven hour break in between each walk in order to loosen his legs, buttocks, and heels. (R. at 55-56.) Mr. Biangamano testified that he must sit down after his walks, as his legs feel weak. (R. at 55.) Mr. Biangamano also testified that he tries to go on walks even on days that he is in pain, as walks seem to relieve his symptoms. (R. at 57.)

Mr. Biangamano also testified that his hobbies include fishing from the bank, collecting baseball cards, watching TV and movies, and reading Readers' Digest and various newspapers. (R. at 48.) Mr. Biangamano testified that, prior to his fall from the

ladder, he went fishing twice per week, but after his fall, he
has only gone once. (R. at 77.) With regards to reading and
watching movies, Mr. Biangamano explained that he understands
what he reads, and for the most part, can concentrate on what a
movie is about. (R. at 48, 54.) However, he also expressed that
pain causes him to lose concentration while watching movies.
(*Id.*)

Mr. Biangamano also testified that he experiences anxiety
brought about by pain and stress, but not in social settings. (R
at 58, 61.) He testified that his anxiety consists of feeling
"fidgety," having chest pains, and severe anger once or twice per
week, which last "a couple of hours." (R. at 58.) To alleviate
his anxiety symptoms, Mr. Biangamano testified that he tries to
distract himself by reading. (R. at 58-59.) Mr. Biangamano
testified that, while sometimes he can sit and read for a half
hour, on days in which he experiences increased pain, he is
unable to concentrate enough to read. (R. at 59.)

Mr. Biangamano also testified that every other week, he goes
to the grocery store with his fiancé. (R. at 54.) He explained
that he sits in the front of the store as she walks down the
aisles to complete the shopping. *Id.* He explained that he can
lift up to fifteen pounds of groceries, and that the last time he
walked the aisles at the grocery store was about one month prior
to the hearing "for something quick." (R. at 49, 54.) Mr.
Biangamano explained that on days in which he experiences
increased pain, he will either stay at home or sit in the car,

instead of going into the grocery store with his fiancé. (R. at 57.)

**B.    Testimony of Ms. Sabrina Cote, Fiancé**

Ms. Sabrina Cote was called as a witness on behalf of Mr. Biangamano. (R. at 62, 64.) She testified that she is Mr. Biangamano's fiancé and has known Mr. Biangamano about a year. (R. at 63.) Ms. Cote testified that she cleans Mr. Biangamano's house, completes his grocery shopping, puts the groceries away, and prepares his meals, as Mr. Biangamano is unable to do so himself. (R. at 64, 66.) She testified that, once in awhile, Mr. Biangamano will walk with her through the aisles of the grocery store; other times, he will write her a list and she will grocery shop for him. (R. at 64.)

Ms. Cote also testified that Mr. Biangamano exercises once or twice a day, and will then take a nap or lie down to rest. (R. at 65.) Ms. Cote testified that days exist when Mr. Biangamano is unable to take walks because of his pain, but she was unsure how often this occurs. (R. at 66.) Ms. Cote also testified that, when watching television, Mr. Biangamano is rarely able to sit through an hour-long episode. (R. at 64.) Ms. Cote testified that, when he sits, Mr. Biangamano always shifts his weight and moves from side to side. (R. at 66.)

**C.    Testimony of Thomas Dunleavy, Vocational Expert**

Next, Thomas Dunleavy, a Vocational Expert ("VE") testified. (R. at 67.) The VE prepared a summary of Mr. Biangamano's work history as a carpet cleaner, janitor, and building maintenance

supervisor. The VE explained that, based on the testimony provided at the hearing, he needed to alter the skill level of Mr. Biangamano's building maintenance position from low-level semi-skilled to a Specific Vocational Preparation ("SVP") rating of 6; skilled, but noted that the exertion level would remain the same in the Dictionary of Occupational Titles. (R. at 68.)

The ALJ then asked the VE to consider multiple limitations in terms of what kind of jobs the hypothetical individuals could perform.(R. at 68-69.) The VE responded that he could not identify any appropriate skilled jobs due to the limitations of standing and walking to only two hours. However, the VE added that the hypothetical individual could perform the following unskilled work: compact assemblers, visual inspector, sorter positions, and cashiers, as these positions allow for sitting, limitations on standing and walking, and do not require lifting over five to ten pounds. (R. at 68-70.) He added that there are approximately 4,000 compact assembler jobs in the Chicago metropolitan area, approximately 3,000 visual inspector and sorter positions in varying industries, but "of a similar work process nature," and at least 3,000 cashier jobs at theater ticket booths and parking lots. (R. at 69-70.)

In a revised hypothetical, the ALJ then added the limitation of concentration. (R. at 70-71.) The VE explained that, under this hypothetical, the number of available jobs would be reduced. (R. at 71.) The cashier position would not be affected (as it would allow for the variation of sitting and standing), but the

compact assembler positions would be reduced to approximately 2,500 positions and the visual inspector and sorter positions would be reduced to at least 1,500 positions. *Id.*

When asked whether the hypothetical worker would be able to rest or withdraw from activity, the VE responded that his ability to perform the job would be contingent on the time-off-task that each job required. *Id.* The ALJ then restated his hypothetical, explaining that the specific restriction provided to the VE was in terms of the hypothetical individual's inability to maintain attention and concentration for extended periods of time. *Id.* When asked by Mr. Biangamano's attorney, the VE determined that such a person would not be able to perform his work if his attention and concentration ranked a four or a five on a ten-point scale and was off-task for 10-minutes of every hour. (R. at 74.)

Regarding the requirement of extended concentration for each job suggested, the VE provided a detailed description of what each job entailed. (R. at 76.) The ALJ then posed a fourth hypothetical of whether the person would be able to work if he was off-task more than ten minutes each hour. (R. at 77.) The VE replied that at the unskilled level, the person would be unable to work. *Id.* The ALJ then posed a fifth hypothetical: everything else taken into consideration except for the ten minutes off-task, if the person had to lie down for one hour out of that work day, whether the person would be able to perform any of the three cited jobs. *Id.* The VE responded that under these circumstances,

the person would "quite certainly be dismissed from the job unless it was a special placement." *Id.*

## II. Medical Evidence

In addition to the testimony of Mr. Biangamano, Ms. Cote, and the VE, the ALJ had before him Mr. Biangamano's medical records.

### A. Medical Records Prior to the Alleged Onset Date

Mr. Biangamano's medical records indicate that he had a past surgical history of a posterior spinal fusion at L5-S1 with Danek screws and plates, as well as a micro-laminectomy in 1992 performed by Dr. Michael D. Kornblatt. (R. at 289, 330.) His medical records indicate that, from June 2005 through April 2008, Mr. Biangamano visited Dr. Sheldon Levine of Tinley Community Medical Center every one to three months for check-ups and refills for his prescription anxiety medication, Ativan. (R. at 327, 335.)

### B. Medical Records After the Alleged Onset Date

Mr. Biangamano's Emergency Room records indicate that on September 1, 2006, he fell four feet from a ladder, landing on his right hip and back. (R. at 240.) As he was not ambulatory at the scene, he was brought to Palos Community Hospital by ambulance. (R. at 240, 248.) X-rays and a CT scan of Mr. Biangamano's lumbar spine and pelvis showed no fracture. (R. at 240.) While in the Emergency Department, Mr. Biangamano was given Morphine for pain and was admitted overnight for observation. *Id.*

On September 5, 2006, Mr. Biangamano visited Dr. Levine for a follow-up appointment. (R. at 330.) In his medical notes, Dr. Levine indicates that Mr. Biangamano fell five feet off of a latter, an ambulance was called, and Mr. Biangamano was prescribed the muscle relaxant, Flexeril, as well as Motrin and Vicodin for pain. *Id.* At the time of his appointment with Dr. Levine, Mr. Biangamano complained of pain in his back, shooting pain down both legs, and numbness in his heels. *Id.* Dr. Levine refilled Mr. Biangamano's prescriptions for Flexeril, Motrin, and Vicodin, and referred Mr. Biangamano to Dr. Kornblatt, Mr. Biangamano's previous orthopedic surgeon. *Id.*

On September 11, 2006, Mr. Biangamano visited Dr. Kornblatt at the Illinois Bone and Joint Institute, who indicated in his report that Mr. Biangamano fell six feet from a latter, landing on his back. (R. at 289-90.) Dr. Kornblatt noted that Mr. Biangamano complained of pain in his low back and numbness into his buttocks and legs, as well as increased back pain with sitting, standing, or walking greater than 20 minutes. *Id.* Dr. Kornblatt also noted that, at this time, Mr. Biangamano could not perform "any heavy-type lifting." *Id.* After physical examination, Dr. Kornblatt determined that Mr. Biangamano was in need of rehabilitation and physical therapy, and advised him to walk and try to remain active. *Id.*

On October 9, 2006, Dr. Kornblatt wrote an office visit note to AIG Claim Services. (R. at 287.) In his note, he explained that Mr. Biangamano had attended physical therapy three times per

week in addition to exercising daily. *Id.* He explained that, while Mr. Biangamano's pain came and went, given his low back pain as well as pain radiating down his right buttock and leg, he diagnosed him with "lumbar disc syndrome with lumbosacral strain and contusion, known degenerative disc disease with facet arthritis." *Id.* In this office note, dated October 9, 2006, Dr. Kornblatt noted, "Mr. Biangamano is unable to work at this time." (R. at 288.)

On November 20, 2006, Dr. Kornblatt noted that Mr. Biangamano was improving regarding his lumbosacral strain and contusion, although he still had right leg paresthesias. (R. at 284.) He noted that Mr. Biangamano's MRI failed to reveal any nerve root compression and he had advised Mr. Biangamano that there were no surgical indications. *Id.* Dr. Kornblatt stated that Mr. Biangamano "may perform light and sedentary duties" and, as his work is heavy, suggested a work hardening program for four weeks. *Id.*

On November 22, 2006, after completing eight weeks of physical therapy, Mr. Biangamano began a work hardening program at Physical Therapy and Spine. (R. at 292.) The initial work hardening report noted that Mr. Biangamano would benefit from a work hardening program to restore his functional strength and allow for a safe return to work activities. *Id.* The report indicated that Mr. Biangamano's rehabilitation potential was "fair" and listed long-term goals to accomplish while participating in the work hardening program. *Id.* On December 18,

2006, Physical Therapist Sheralee Shah sent Dr. Kornblatt a progress note regarding the work Mr. Biangamano had completed at Physical Therapy and Spine. (R. at 291.) She reported that Mr. Biangamano had attended work hardening for three weeks, progressed from a two to a four-hour program, and noted that he would benefit from two more weeks, with the goal of progressing to five days per week. *Id.* Her report noted that Mr. Biangamano "continues to progress slowly. While he is able to repetitively lift, carry, push and pull ten pounds," she stated that Mr. Biangmano "still complains of occasional shooting pain in his right leg, low back stiffness, and increased pain and throbbing in his heals." *Id.* There is no indication in the record provided that Mr. Biangamano continued physical therapy after December, 2006.

On March 12, 2007, Dr. Kornblatt wrote another office visit note to AIG Claim Services. (R. at 279.) In his note, Dr. Kornblatt stated that, despite significant conservative management, Mr. Biangamano continued to complain of pain radiating into his right leg. *Id.* He explained that, because Mr. Biangamano continued to complain of pain despite any significant findings on examination, and no surgical indications existed, Mr. Biangamano should seek pain management with a rheumatologist and remain as active as possible. (R. at 279.)

On May 29, 2007, Mr. Biangamano underwent an evaluation by Dr. Holly Carobene with Comprehensive Pain Care, due to his complaint that "standing or walking more than 30 minutes

increases his pain and lying down decreases his pain," with his level of pain ranging from a five to a nine out of ten. (R. at 354.) As a result of her evaluation, Dr. Carobene suggested a right L4 selective nerve block to provide therapeutic intervention. *Id.* On June 7, 2007, Mr. Biangamano received a selective nerve root block and Epiduralgram by Dr. Carobene to treat his lumbar radiculopathy. (R. at 339.) Following the nerve block, Mr. Biangamano reported a decrease in his pain in his right leg. *Id.* On July 3, 2007, Mr. Biangamano received a second selective nerve root block and Epiduralgram by Dr. Carobene. (R. at 266, 338.)

On August 6, 2007, Mr. Biangamano visited Dr. Kornblatt, who indicated that, upon examination, Mr. Biangamano had "continued right radicular leg pain without significant findings." (R. at 278.) Dr. Kornblatt's notes reveal that Mr. Biangamano had undergone three transforaminal epidural steroid injections, each of which provided ten to twelve days of relief. *Id.* He further indicated that clinically, no surgical indications existed and he advised Mr. Biangamano to seek neurologic evaluation and medical management for his right sciatica. *Id.* He provided him a prescription for Vicodin, without a refill, and observed that Mr. Biangamano should undergo a functional capacity evaluation and then resume gainful employment, as, at the time of his visit, Mr. Biangamano had yet to return to work. *Id.*

Mr. Biangamano continued to visit Dr. Levine for Ativan refills and general check-ups every one to three months from

September 2006 through April 2008. (R. at 331-336.) In addition
to documenting the existence of Mr. Biangamano's pain, inability
to work, and his desire to see a pain specialist, Dr. Levine also
documented that Mr. Biangamano was "very stressed" on four
occasions from June 2007 through March 2008. (R. at 334-335.) Dr.
Levine's notes, however, are void of any detail pertaining to the
degree of Mr. Biangamano's stress nor do they include any form of
psychological testing or recommendation or referral to see a
psychotherapist. (R. at 327-336.)

C. **Medical Evaluations for Disability Insurance Benefits**

On February 18, 2008, Mr. Biangamano underwent an Internal
Medicine Consultative Examination for the purpose of providing
information to the Bureau of Disability Determination Services.
(R. at 297.) Dr. M.S. Patil, a Family Practice and Emergency
Medicine doctor, spent 30 minutes with Mr. Biangamano and also
reviewed all records sent by Disability Determination Services.
*Id.* In his report, Dr. Patil noted that Mr. Biangamano underwent
a micro-laminectomy in 1991 at Palos Community Hospital and
spinal fusion surgery in 1992 at Rush Hospital. *Id.* Dr. Patil
reported that Mr. Biangamano's chief complaint was constant, mild
to moderate back pain that radiated to his right buttock, groin
and leg, with numbness and weakness in his right leg ranging from
a seven or an eight on a ten-point scale. *Id.* Dr.

In his report. Dr. Patil noted that Mr. Biangamano was
moderately anxious, but otherwise his mentation was normal. (R.
at 297, 300.) He noted that Mr. Biangamano had taken Ativan for

16

the last year and a half. (R. at 300.) He also noted that Mr. Biangamano did not have a history of receiving inpatient psychiatric care, but was prescribed anxiety medication by his primary care physician. *Id.*

On February 27, 2008, Dr. David L. Biscardi, Ph.D, completed a Psychiatric Review Technique on Mr. Biangamano. Dr. Biscardi determined that Mr. Biangamano's medical disposition of anxiety was an impairment that was not severe. (R. at 303.) He determined that Mr. Biangamano's medical disposition category fell under section 12.06, "Anxiety-Related Disorders." *Id.* Based on eligibility criteria under §12.06, Dr. Biscardi determined that Mr. Biangamano's anxiety-related disorder was not evidenced by generalized persistent anxiety, a persistent irrational fear of a specific object, activity or situation, or recurrent obsessions or compulsions. (R. at 308.) Rather, Dr. Biscardi determined that a medically determinable impairment was present that did not precisely satisfy the diagnostic criteria, and defined Mr. Biangamano's anxiety as "diagnosed by history." *Id.*

Dr. Biscardi determined that Mr. Biangamano did not experience any degree of limitation with regards to restriction of activities of daily living or episodes of decomposition of extended duration. (R. at 313.) However, Dr. Biscardi determined that Mr. Biangamano did experience a mild degree of limitation in maintaining social functioning and difficulties in maintaining concentration, persistence, or pace. *Id.* Dr. Biscardi also noted that Mr. Biangamano did not have a history of psychiatric

hospitalizations or a treating source for psychiatric care. (R. at 315.) He noted that Mr. Biangamano had a history of anxiety and was moderately anxious, but otherwise his mentation was normal; he could handle funds and was independent in functioning on a daily basis. *Id.*

On February 29, 2008, Dr. Bharati Jhaveri completed a Physical Residual Functional Capacity Assessment ("RFC") of Mr. Biangamano. (R. at 324.) In this assessment, Dr. Jhaveri noted that Mr. Biangamano reported that he walks for 20 minutes at a time multiple times per day, as well as performs light housework, such as vacuuming and washing dishes (R. at 318.) Based on Mr. Biangamano's statements, as well as his past history of spinal surgery in 1992, Dr. Jhaveri opined that Mr. Biangamano could occasionally lift and/or carry 20 pounds; could frequently lift and/or carry 10 pounds; could stand and/or walk (with normal breaks) for a total of about six hours in an 8-hour workday; could sit (with normal breaks) for a total of about six hours in an 8-hour workday; and could push and/or pull (including operation of hand and/or foot controls) for an unlimited duration, except for the restrictions listed for lifting and carrying. *Id.* Based on Mr. Biangamano's reduced range of motion in his lumbar spine, Dr. Jhaveri determined that Mr. Biangamano occasionally has postural limitations in the following areas: climbing ramp/stairs and ladders/ropes/scaffolds; stooping; crouching; and crawling. (R. at 319.) He further determined that

18

Mr. Biangamano does not experience manipulative, visual, communicative, or environmental limitations. (R. at 320-321.)

On May 1, 2008 and May 7, 2008, Consultant Physician Reynaldo Gotanco and Psychologist Erika Altman signed an Illinois Request for Medical Advice ("IRMA Assessment"). (R. at 356.) After reviewing all of the evidence in the file, Drs. Reynaldo Gotanco and Erika Altman affirmed the RFC of February 29, 2008, as well as the Psychiatric Review Technique Form ("PRTF") and Mental Residual Functional Capacity ("MRFC") of February 27, 2008. (R. at 357.) The IRMA Assessment noted that, at the initial level, Mr. Biangamano indicated a history of anxiety, he had not previously reported any significant psychological limitations related to anxiety while taking Ativan, nor did he have a history of inpatient psychiatric treatment. (R. at 319, 358.) The report also evaluated Mr. Biangamano's condition as not severe. (R. at 358.)

### THE ALJ'S DECISION

On September 23, 2009, the ALJ issued his decision, ruling that Mr. Biangamano was not disabled under sections 216(i) and 223(d) of the Social Security Act. (R. at 31.)

Initially, the ALJ determined that Mr. Biangamano met the insured status requirements of the Social Security Act through December 31, 2011, and that he had not engaged in substantial gainful activity since September 1, 2006, the alleged onset date. (R. at 21.) The ALJ ruled that Mr. Biangamano's severe impairments included degenerative disc disease, arthritis, and a

slip and fall from a ladder, but ruled that his medically
determinable impairment of anxiety was non-severe. *Id.*

The ALJ explained that, while Mr. Biangamano clearly
established, through medical records, that he suffers from
degenerative disc disease, there is no objective indication that
his condition has resulted in nerve root compression, spinal
arachnoiditis or lumbar spinal stenosis. (R. at 23.) The ALJ
noted that, because Mr. Biangamano could ambulate effectively
without assistance and had not experienced any sensory or reflex
loss, he did not meet the requirements of the listing. *Id.*

The ALJ also ruled that Mr. Biangamano has the residual
functional capacity to perform light work as defined in 20 CFR
404.1567(b), except that he can only stand or walk for a total of
two hours in an eight hour day, should avoid all exposure to
working at heights or climbing ladders, and can only occasionally
bend. *Id.* He also explained that Mr. Biangamano has a mild to
moderate inability to maintain attention and concentration for
extended periods of time due to his level of pain and discomfort.
*Id.*

The ALJ noted that, while Mr. Biangamano's medically
determinable impairments could reasonably be expected to cause
his alleged symptoms, his statements concerning the intensity,
persistence, and limiting effects of these symptoms were not
credible to the extent they were inconsistent with the RFC. (R.
at 25.)

Taking into consideration Mr. Biangamano's own allegations regarding his inability to stand or walk for extended periods of time, as well as documentation provided in the record, the ALJ concluded that Mr. Biangamano could work at the light exertion level, and stand or walk no more than two hours in an eight hour day. (R. at 28.) Additionally, the ALJ included a caveat that Mr. Biangamano has a mild to moderate inability to maintain attention and concentration for extended periods of time; however, he determined that the objective evidence in the record did not justify any further limitations. *Id.*

Using this RFC, the ALJ determined that Mr. Biangamano was unable to perform any past relevant work as a carpet cleaner, building maintenance supervisor, or material handler. (R. at 28-29.) At step five, the ALJ explained that Mr. Biangamano was 42 years old at the time, which was defined as a younger individual, that he had a high school education, and communicated in English. (R. at 29.) He also explained that transferability of job skills was not material to the determination of disability in this case because Mr. Biangamano was "not disabled," whether or not he has transferable job skills. *Id.*

Considering the above information, the ALJ found that Mr. Biangamano could perform a significant number of jobs that exist in the region of the Chicago metropolitan area and the national economy. *Id.* He noted the VE's testimony of the following unskilled sedentary jobs in the regional economy: compact assembler, 4,000 jobs; visual inspector or sorter, 3,000 jobs;

and cashier, 3,000 jobs. (R. at 30.) The ALJ noted that, even if
Mr. Biangamano's RFC was further limited to lifting no more than
fifteen pounds occasionally and not walking, standing, or sitting
for longer than thirty minutes at a time, such jobs would still
exist in reduced numbers (e.g. 2,500 compact assembler jobs;
1,500 visual inspector jobs; and 3,000 cashier jobs). *Id.* The ALJ
found that, based on the VE's testimony, Mr. Biangamano was
capable of making a successful adjustment to other work that
existed in significant numbers in the national economy. *Id.* The
ALJ ultimately concluded that Mr. Biangamano had not been under a
disability, as defined in the Social Security act, from September
1, 2006, through the date of his decision. (R. at 31.)

## SOCIAL SECURITY REGULATIONS

When an individual claims the need for DIB, he must prove
the existence of disability under the terms of the SSA. *McCoy v.
Astrue*, 10 C 2016, 2011 WL 3294732 at *11 (N.D. Ill. July 29,
2011) citing 42 U.S.C. § 1382c(a)(3)(C). In determining whether
an individual is eligible for benefits, the Social Security
Regulations ("SSR") require a sequential five-step analysis.
*Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). First, the
ALJ must determine whether the claimant is currently employed;
second, a determination must be made as to whether the claimant
has a severe impairment; third, the ALJ must determine whether
the impairment meets or equals one of the impairments listed by
the Commissioner in 20 C.F.R. part 404, subpart P, appendix 1,
§12.00 et seq.; fourth, the ALJ must determine the claimant's

22

RFC; and fifth, the ALJ must decide whether the claimant is capable of performing work in the national economy. *Knight*, 55 F.3d at 313. At steps one through four, the claimant bears the burden of proof; at step five, the burden shifts to the Commissioner. *Id.*

**STANDARD OF REVIEW**

A district court reviewing an ALJ's decision must affirm if the decision is supported by substantial evidence and is free from legal error. 42 U.S.C. § 505(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla;" rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In reviewing an ALJ's decision for substantial evidence, the Court may not "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). An ALJ must articulate his analysis by building an accurate and logical bridge from the evidence to his conclusions, so that the Court may afford the claimant meaningful review of the SSA's findings. *Steele*, 290 F.3d at 941. It is not enough that the record contains evidence to support the ALJ's

decision; if the ALJ does not rationally articulate the grounds of that decision, or if the decision is not sufficiently articulated so as to prevent meaningful review, the Court must remand. *Id.*

### DISCUSSION

Mr. Biangamano argues that the ALJ erred in his opinion in three ways, and thus, this case should be remanded for further proceedings. First, he argues that the ALJ did not properly account for his anxiety disorder. Second, Mr. Biangamano argues that the ALJ did not properly evaluate his physical impairments. Third, he argues that the ALJ's hypothetical question to the vocational expert was vague and not presented in work-related terms. The Court rejects all three arguments.

## I. Proper Account of Anxiety Disorder

Mr. Biangamano argues that the ALJ erred in his ruling, because he did not properly account for his anxiety disorder. First, Mr. Biangamano contends that the ALJ failed to discuss all relevant evidence of his alleged anxiety. Second, Mr. Biangamano argues that the ALJ failed to properly evaluate the limitations caused by Mr. Biangamano's anxiety. Third, Mr. Biangamano argues that the ALJ unreasonably relied on the State Agency psychologist. And finally, Mr. Biangamano contends that, since the ALJ failed to properly account for his anxiety at Step 2, he did not include a proper account of Mr. Biangamano's limitations in the RFC assessment and hypothetical to the VE.

## A.  Discussion of Relevant Evidence Pertaining to Anxiety

Mr. Biangamano argues that the ALJ erred in failing to discuss all relevant evidence of his alleged anxiety. (Motion at 4.) Mr. Biangamano states that the ALJ selectively discussed evidence provided in the record to support his finding that Mr. Biangamano's anxiety was not severe. (Mot. at 5.) Specifically, Mr. Biangamano contends that the ALJ ignored Dr. Levine's notes that state that Mr. Biangamano was "very stressed." *Id.* In response, the Commissioner argues that the ALJ properly evaluated the evidence when the ALJ noted that the record was void as to objective evidence supporting Mr. Biangamano's allegations and significant treatment from a mental health specialist. (Response at 5.) The Commissioner further argues that, "the notes document Plaintiff's subjective reports of 'very stressed,' but Dr. Levine at no time comments that these complaints warranted greater treatment or investigation." (Resp. at 6.)

An ALJ's decision will be upheld so long as it is supported by substantial evidence in the record. *Craft v. Astrue,* 539 F.3d 668, 673 (7th Cir. 2008). A decision denying benefits need not discuss every piece of evidence; however, an ALJ must minimally articulate his justification for rejecting or accepting specific evidence of disability. *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010)(citing *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009)). Additionally, rather than providing a written evaluation of every piece of evidence that is presented, the ALJ must establish an accurate and logical bridge between the

evidence and his conclusions. *Craft,* 539 F.3d at 673. In this case, the ALJ stated:

> The claimant's medically determinable impairment
> of anxiety does not cause more than minimal
> limitation in the claimant's ability to perform
> basic mental work activities and is therefore non-
> severe. This determination is largely based on the
> fact that the claimant's medical record does not
> contain any evidence that he has ever received any
> sort of psychological or psychiatric inpatient or
> outpatient treatment, despite his allegations of
> work-related limitations stemming from his
> anxiety. (R. at 21.)

In reaching his decision, the ALJ supported his opinion by substantial evidence. He explained that Mr. Biangamano's anxiety was non-severe because the record did not contain evidence pertaining to psychological treatment and Mr. Biangamano's alleged anxiety minimally limited his ability to work. (R. at 21.) Therefore, since the ALJ supported his decision by substantial evidence, Mr. Biangamano's argument that the ALJ erred in failing to discuss all relevant evidence of his alleged anxiety is rejected.

## B. Evaluation of Limitations Resulting From Anxiety

Mr. Biangamano next argues that the ALJ failed to evaluate Mr. Biangamano's limitations caused by his anxiety impairment. Mr. Biangamano contends that, "the ALJ acknowledged Plaintiff's testimony that his anxiety results in severe anger, chest pain, and stress, yet did not explain whether this was credible, and did not include any related limitations in the RFC assessment." (Mot. at 7.) Further, Mr. Biangamano argues that his symptoms of anxiety "could cause limitations in relating to the public, co-

workers, and supervisors; could require additional breaks when he had attacks; and could cause him to be off-task more than 15 percent of the time." (Mot. at 8.) Finally, Mr. Biangamano argues that the ALJ's decision was made in error as he did not consider that Mr. Biangamano's insurance eventually ran out, preventing him from seeing Dr. Levine. (Mot. at 7.)

The Commissioner responds that, both the ALJ and State Agency psychologists "recognized that Plaintiff's daily activities did not disclose any significant psychological limitation." (Resp. at 5.) Further, the Commissioner argues that, despite the fact that Mr. Biangamano had taken Ativan for anxiety for more than one year prior to his onset of disability, he "never alleged that his anxiety and Ativan interfered with his ability to perform his past skilled work." (Resp. at 7.) Finally, the Commissioner responds that, even when Mr. Biangamano did have insurance, his primary care physician never referred him to a mental health specialist for treatment. (Resp. at 6.)

In considering the severity of Mr. Biangamano's anxiety, the ALJ considered four broad functional areas set out in the disability regulations for evaluating mental disorders as well as in section 12.00C of the Listing of Impairments (R. at 22; 20 C.F.R. part 404, subpart P, appendix 1, §12.00 et seq.) The four broad functional areas, known as the "paragraph B" criteria," are as follows: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation. (R. at 22.) The ALJ must rate the

27

claimant's limitation in the first three categories as none, mild, moderate, marked, or extreme, and number the claimant's episodes of decompensation. 20 C.F.R. § 404.1520(a)(d)(1). If the ALJ rates the degree of the claimant's limitation as 'none' or 'mild,' in the first three functional areas, and as 'none' in the fourth area, the ALJ may conclude that the claimant's impairment is not severe, "unless the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities." *Id.*

In this case, in his discussion of activities of daily living, the ALJ noted that, "despite his impairments, Mr. Biangamano testified to a... wide range of activities" including reading, watching television and going fishing. (R. at 22.) He further noted that Mr. Biangamano's "testimony and written responses regarding his daily activities support a finding that any limitation is caused by his physical impairments rather than his anxiety." *Id.* Second, in considering social functioning, the ALJ noted that Mr. Biangamano "testified that his anxiety does not arise in social situations, but rather simply as a result of his concerns regarding his back impairment... There is otherwise no evidence to indicate that the claimant's level of social functioning is diminished by his anxiety." *Id.* Third, in discussing concentration, persistence or pace, the ALJ stated that, "the Claimant has mild limitations as a result of his mental impairment" and "the State Agency examiner also found that

the Claimant had mild limitations in this area." *Id.* Fourth, in considering episodes of decompensation, the ALJ stated:

> The claimant has not experienced any episodes
> of decompensation for an extended duration.
> The claimant has never even been given
> outpatient treatment, let alone been
> hospitalized, as a result of his anxiety.
> There is also no indication that he has ever
> experienced an exacerbation of his relatively
> minor symptoms. The State Agency psychiatric
> examiner also found that the claimant had not
> experienced any episodes of decompensation.
> *Id.*

In reaching his conclusion that Mr. Biangamano's anxiety was non-severe, the ALJ stated:

> The undersigned finds there to be very little
> objective support for the claimant's
> allegations with regard to the limiting
> effects of his mental impairment. Because the
> claimant's medically determinable mental
> impairment causes no more than 'mild'
> limitation in any of the first three
> functional areas and 'no' episodes of
> decompensation which have been of extended
> duration in the fourth area, it is non-
> severe... Therefore, the following residual
> functional capacity assessment reflects the
> degree of limitation the undersigned has
> found in the 'paragraph B' mental function
> analysis. (R. at 23.)

The ALJ articulated his justification for rejecting Mr. Biangamano's disability by analyzing the "Paragraph B" criterion set out in the regulations and correctly applied the regulations regarding the evaluation of mental impairments as stated in 20 CFR 404.1520a. Therefore, because the ALJ was justified in reaching his conclusion that Mr. Biangamano's anxiety was non-severe, Mr. Biangamano's argument that the ALJ failed to evaluate

the limitations caused by Mr. Biangamano's anxiety impairment fails.

### C.   Reliance on State Agency Psychologist

Mr. Biangamano next argues that the ALJ erred in relying on the State Agency psychologist's opinion. He contends that the ALJ mischaracterized the State Agency reviewing doctor's opinion regarding Mr. Biangamano's anxiety and erred in granting significant weight to his opinion. First, Mr. Biangamano argues that the ALJ mischaracterized the State Agency reviewing doctor's opinion regarding Mr. Biangamano's anxiety in determining that his anxiety was "not severe." (Mot. at 6.) Mr. Biangamano contends that, "the ALJ stated that even when the State Agency doctor viewed the evidence 'in a light most favorable to the claimant,' his anxiety was 'at most' a non-severe impairment." *Id.* In contrast, Mr. Biangamano argues that the doctor actually stated that, "claimant was moderately anxious, otherwise mentation is normal." *Id.* The Commissioner responds that the ALJ "reasonably relied on the State Agency psychologists' uncontradicted medical opinions to find that Plaintiff's anxiety caused no more than mild limitations and was not severe." (Resp. at 3.)

An ALJ may reasonably rely on uncontradicted medical opinions of a consulting physician. *Chambers v. Shalala*, 93 C 6917, 1995 WL 228965 at *11 (N.D. Ill. Apr. 14, 1995). Additionally, the claimant holds the primary responsibility for producing medical evidence demonstrating the severity of

impairments. *Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004). Here, the ALJ stated:

> A State Agency psychiatric examiner reviewed the claimant's medical record in February of 2008 and determined that the claimant had a history of anxiety, but even when examined in a light most favorable to the claimant, that at most this was a non-severe mental impairment. In making his determination, this examiner stressed the fact that the claimant had no history of psychiatric hospitalizations and had no treating sources for psychiatric care. There are no treating source opinions indicating that the claimant's anxiety results in any work-related limitations. (R. at 22.)

The ALJ reasonably relied on the State Agency doctor's uncontradicted opinions and reasonably drew the conclusion, based on the evidence provided in the record, that although Mr. Biangamano was "moderately anxious" at the time of the State Agency psychologist's evaluation, his anxiety was nonetheless non-severe. Therefore, because the ALJ properly and reasonably relied on the State Agency doctor's opinion, Mr. Biangamano's argument fails.

Mr. Biangamano next argues that the ALJ erred in granting significant weight to the State Agency doctor's opinion. Mr. Biangamano contends that the State Agency doctor's opinion should not be granted significant weight because the reviewing doctor did not review the treatment notes completed by Mr. Biangamano's treating physician, which provided a "longitudinal record of anxiety." (Mot. at 6.) Further, Mr. Biangamano argues that the ALJ did not "discuss the substance of these notes before relying on the opinion of the State Agency doctor." *Id.* In response, the Commissioner argues that "psychologist Dr. Altman in fact

reviewed Dr. Levine's notes, and then affirmed Dr. Biscardi's mental assessment. In addition, there is no medical evidence in the record whatsoever that was not considered by Dr. Altman." (Resp. at 4.) However, Mr. Biangamano contends that:

> The form the Commissioner attributes to Dr. Altman was not completed by Dr. Altman, but rather an unnamed administrative claims representative. (R. at 93.) Not only does it appear that this was not completed by a medical source, but it is unsigned [and] undated... The form actually signed by Dr. Altman (R. at 358), gives no indication she reviewed the treatment notes from Dr. Levine, the treating source. (Mot. at 2.)

According to the SSR, State Agency doctors consider evidence provided by the claimant in the case record and "make findings of fact about the medical issues, including, but not limited to, the existence and severity" of impairments and symptoms. 20 C.F.R. § 404.1527(f)(1)(i). Mr. Biangamano does not provide a sufficient argument to show that the State Agency doctor did not review the entire record. In this case, the State Agency medical doctor's evaluation form points out that in evaluating Mr. Biangamano, he did review all of the evidence in the file. (R. at 357-58.)

Next, Mr. Biangamano argues that the ALJ should not have relied on the State Agency doctor's opinion. The ALJ is required to determine which examining doctors' opinions should receive weight and must explain the reasons for that finding. *Craft*, 539 F.3d at 676. A treating physician's opinion concerning the nature and severity of a claimant's injuries receives controlling weight over a State Agency doctor or other consulting physician only when it is "well-supported by medically acceptable clinical and

laboratory diagnostic techniques" and is "consistent with substantial evidence in the record." 20 C.F.R. § 404.1527(d)(2); *see also Schmidt*, 496 F.3d at 842. Accordingly, if the treating physician's opinion is based solely on the patient's subjective complaints, the ALJ may discount it. *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008).

Here, the ALJ:

> Gave significant weight to the findings of the consultative examiner pertaining to the claimant's mental impairment. These findings were the product of medically acceptable diagnostic techniques and they give adequate weight to the subjective allegations of the claimant. (R. at 23.)

The ALJ further stated, "the undersigned finds there to be very little objective support for the claimant's allegations with regard to the limiting effects of his mental impairment." *Id.* Relying on substantial evidence to support his opinion, the ALJ reasonably relied on the State Agency doctor's opinion in reaching the determination that Mr. Biangamano's anxiety was non-severe. Therefore, Mr. Biangamano's argument that the ALJ improperly gave the State Agency doctor's opinion significant weight is rejected.

### D. Account of Limitations in RFC Assessment and Hypothetical

Mr. Biangamano contends that, since the ALJ failed to properly account for his anxiety at Step 2, he did not properly consider Mr. Biangamano's limitations in considering the RFC. (Mot. at 7.) Mr. Biangamano argues that the ALJ failed to "include all limitations resulting from Plaintiff's impairments,

even those found to be 'not severe.'" *Id.* The Commissioner
responds that the ALJ "acknowledged Plaintiff's testimony and
spent three pages discussing Plaintiff's anxiety, the treatment
records, the medical opinions, Plaintiff's activities, and the
fact that there was 'very little objective support for the
claimant's allegations with regard to the limiting effects of his
mental impairment.'" (Resp. at 7.)

In assessing a claimant's RFC, the ALJ must "consider
limitations and restrictions imposed by all of an individual's
impairments, even those that are not 'severe.'" *Koswenda v.
Astrue*, 08 C 4732, 2009 WL 958542 at *5 (N.D. Ill. Apr. 2, 2009)
(citing SSR 96-8p 1996 WL 374184 at *5 (July 2, 1996). In this
case, the ALJ considered Mr. Biangamano's history of anxiety in
formulating the RFC, noting that he had a "mild to moderate
inability to maintain attention and concentration for extended
periods of time due to his level of pain and discomfort." (R. at
23.) Additionally, the ALJ also included those limitations
regarding concentration in his hypothetical to the VE. The Court
finds that the ALJ properly accounted for Mr. Biangamano's
anxiety disorder, therefore, Mr. Biangamano's argument that the
ALJ's did not properly account for Mr. Biangamano's anxiety
disorder fails.

## II. Proper Evaluation of Physical Impairments

Mr. Biangamano next argues that the ALJ's decision warrants
reversal because the ALJ erred by failing to properly evaluate
Mr. Biangamano's physical impairments. First, he argues that the

34

ALJ improperly assigned little weight to Dr. Carobene's findings. Next, he argues that the ALJ was patently wrong in making his credibility finding.

### A.   Dr. Carobene's Findings

Mr. Biangamano argues that the ALJ improperly assigned little weight to Dr. Carobene, Mr. Biangamano's treating physician, and therefore the ALJ's decision warrants reversal. (Mot. at 9.) Mr. Biangamano contends that the ALJ "played doctor" by failing to specifically mention Dr. Carobene's finding of "increased tone in the paravertebral musculature at the lumbar spine level, which can cause pain." (Mot. at 9-10; R. at 263.) The Commissioner responds that the ALJ reasonably relied on the uncontradicted reports by Dr. Kornblatt and the State Agency physician and that he did not "play doctor," as both physicians reviewed Dr. Carobene's notes prior to completing their reports. (Resp. at 9.)

An ALJ "must not succumb to the temptation to play doctor" and substitute his own judgment for that of an expert. *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996). An ALJ may, however, thoroughly consider a doctor's opinion and, based on contradictory objective medical evidence contained in the record, decide to afford it little weight. *Copeland v. Astrue*, 776 F.Supp. 2d 828, 837 (N.D. Ind. 2011). Further, an ALJ need not mention every piece of evidence. *Campbell,* 627 F.3d at 306.

In this case, the ALJ explained his reasoning for giving Dr. Carobene's diagnosis little weight. He stated:

> Even [Dr. Carobene's] findings on clinical examination show
> that the claimant still retained a large degree of
> functional ability despite his back impairment. The fact
> that the claimant was taking... medications weighs in his
> favor. However, due to the lack of any more intense or
> limiting symptoms, it appears that these medications, in
> addition to the injections, were fairly effective in
> alleviating his pain. Despite Dr. Carobene's clinically
> significant findings, the claimant's neurological and other
> clinical findings have nonetheless been overwhelmingly
> benign, and certainly do not support a finding of greater
> limitations than the ones included by the undersigned in the
> claimant's residual functional capacity. (R. at 27.)

Here, the ALJ thoroughly considered Dr. Carobene's notes in
his findings. In considering Dr. Carobene's report with the
totality of the evidence in the record, the ALJ reasonably
afforded it little weight. Further, the ALJ did not substitute
his own opinion for that of the experts in reaching his decision,
as he relied on clinical findings from other physicians, Dr.
Kornblatt and Dr. Patil, in the record. Therefore, Mr.
Biangamano's argument that the ALJ assigned too little weight to
Dr. Carobene's report fails.

### B. Explanation of Credibility Determination

Mr. Biangamano next argues that the ALJ's decision should be
reversed because he failed to make an appropriate credibility
determination. He contends that the ALJ's decision was patently
wrong, as the ALJ did not sufficiently explain why he discredited
Mr. Biangamano's credibility. First, Mr. Biangamano argues that
the ALJ did not discuss whether Mr. Biangamano's spinal
impairments could reasonably have resulted in the specific
allegations Mr. Biangamano testified to at the hearing. Second,
Mr. Biangamano argues that the ALJ improperly considered Mr.

36

Biangamano's daily activities as well as the type, dosage, and effectiveness of medication in reaching a credibility determination. Third, Mr. Biangamano contends that the ALJ failed to sufficiently explain why work hardening diminished Mr. Biangamano's credibility.

### 1. Proper Consideration of Spinal Impairments

First, Mr. Biangamano argues that, because the ALJ's credibility finding was patently wrong, as he did not sufficiently explain why he discredited Mr. Biangamano's credibility, the ALJ's decision should be reversed. Mr. Biangamano argues that the ALJ did not discuss whether Mr. Biangamano's spinal impairments could reasonably have resulted in the specific allegations Mr. Biangamano testified to at the hearing. Mr. Biangamano contends that the ALJ recited Mr. Biangamano's testimony that he had to lie down two times per day; however, he failed to explain whether this limitation or any other specific limitations Mr. Biangamano testified to could reasonably have been caused by Mr. Biangamano's impairment. (Mot. at 13.) The Commissioner responds that the ALJ's finding was not patently wrong, as he explicitly found that Mr. Biangamano's impairments could reasonably be expected to cause his symptoms. (Resp. at 11.)

The Seventh Circuit has determined that ALJs are in the best position to determine a witness's credibility and will only overturn an ALJ's credibility determination if it is "patently wrong." *Skarbek v. Barnhart*, 390 F.3d 500, 504-05 (7th Cir.

2004). An ALJ's determination will be declared patently wrong when his decision lacks any explanation or support. *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008). So long as the ALJ gives specific reasons that are supported by the record for his finding, courts will affirm the decision. *Elder*, 529 F.3d at 413-14.

Here, the ALJ stated, "After careful consideration of the evidence... the undersigned finds... the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the... residual functional capacity assessment." (R. at 25.) The ALJ relied on the objective medical and other probative and credible evidence that undercut Mr. Biangamano's credibility; e.g. Dr. Patil and the State Agency disability examiner. He explained that he gave significant weight to both doctor's findings, as they were the product of:

> Medically acceptable diagnostic techniques, making these finding even more significant. Most importantly, these evaluations further confirm that the intensity and limiting effects of the claimant's symptoms are certainly not as extensive as he alleges, as their findings would suggest basic postural limitations, but nothing which rises to a level of severity which would preclude the claimant from working altogether. (R. at 28.)

The ALJ continued:

> Any further limitations are simply not justified by the objective evidence of record, and therefore the undersigned's residual functional capacity assessment adequately and fairly accounts for each of the claimant's objectively verifiable

symptoms and limitations. *Id.*

Here, the ALJ's explanations for his reasoning are supported by evidence provided in the record. Because the ALJ gave specific reasons for his findings regarding Mr. Biangamano's credibility, the ALJ's decision is not patently wrong. Therefore, Mr. Biangamano's argument that the ALJ's decision should be reversed with regards to this point fails.

### 2. Proper Consideration of Daily Activities and Medication

Mr. Biangamano argues that the ALJ's decision should be reversed because he improperly considered Mr. Biangamano's daily activities as well as the type, dosage, and effectiveness of Mr. Biangamano's medication in reaching a credibility determination. Regarding his activities of daily living, Mr. Biangamano contends that the ALJ erred by mischaracterizing Mr. Biangamano's testimony that he "still enjoys fishing," instead of stating that "since the injury in September 2006...he had gone fishing only once." (Mot. at 14.) As to the type, dosage, and effectiveness of his medications, Mr. Biangamano argues that the ALJ incorrectly concluded that Mr. Biangamano's medication and epidural injections were effective in relieving his pain. (Mot. at 15.) The Commissioner responds that the ALJ did not mischaracterize nor misunderstand Mr. Biangamano's testimony regarding fishing, nor did he "indicate that he was using these activities to lessen Plaintiff's credibility." (Resp. at 14.) Additionally, the Commissioner sets forth that the ALJ noted, "the fact that the

claimant was taking the aforementioned medications weighs in his
favor." *Id.*

An ALJ must substantiate his credibility finding with
specific and logical reasons, based on the record as a whole.
*Giles ex rel. Giles v. Astrue,* 483 F.3d 483, 488-89 (7th Cir.
2007). Additionally, the ALJ should consider such factors as
objective medical evidence; the claimant's daily activities; the
claimant's treatment history; and the type, dosage, and side
effects of any medications. *Brihn v. Astrue*, 332 F. App'x 329,
333 (7th Cir. 2009); s*ee also* 20 C.F.R. § 404.1529(c) *and* SSR 96-
7p, 1996 WL 374186 at *3 (July 2, 1006).
Here, with regard to Mr. Biangamano's daily activities, the ALJ
noted Mr. Biangamano's testimony:

> The claimant testified that he normally
> spends his day walking for about 20 minutes
> at a time, attempting to get exercise, and
> lying down two times per day. The claimant
> does laundry, but does not usually perform
> other household chores. He stated that he
> often experiences difficulty sleeping at
> night due to his pain, and that he does not
> cook meals. The claimant stated that he still
> enjoys fishing, and he normally fishes off
> the bank. He also watches television, and
> reads various magazines and newspapers. (R.
> at 24-25.)

In considering Mr. Biangamano's medications, the ALJ noted that,
despite his back impairment, Mr. Biangamano "retained a large
degree of functional ability." (R. at 27.) He noted:

> The fact that the claimant was taking
> [Vytorin, Ativan, Flexeril, Motrin and
> Vicodin] weighs in his favor. However, due to

> the lack of any more intense or limiting
> symptoms, it appears that these medications,
> in addition to the injections, were fairly
> effective in alleviating his pain. *Id.*

As discussed above, the ALJ also considered the medical evidence
and clinical findings presented in the record. In considering the
entire record as a whole, the ALJ referred to both Mr.
Biangamano's activities of daily living and his medications, as
well as objective medical evidence and clinical findings. Because
the ALJ properly considered the impact of Mr. Biangamano's
activities of daily living and medications, as well as gave
specific and logical reasons for his findings, Mr. Biangamano's
claim that the ALJ erred in making his credibility determination
fails.

### 3. Proper Consideration of Work Hardening Program

Mr. Biangamano contends that the ALJ's decision warrants
reversal because the ALJ failed to sufficiently explain why
participation in the work hardening program diminished Mr.
Biangamano's credibility. (Mot. at 12.) Mr. Biangamano argues
that, while he participated in work hardening, records suggest
that it was not successful. *Id.* The Commissioner responds that
the goal of work hardening was to return to medium or heavy work
and that the treatment notes did not suggest that "the goals were
unattainable, much less that Plaintiff would not be able of
performing the limited light work found by the ALJ." (Resp. at
12.) As discussed above, in making credibility determinations,
the ALJ should consider such factors as... the claimant's

41

treatment history; however, so long as the ALJ bases his determination on a combination of medical evidence and his perception of the witness, the credibility finding should not be disturbed. *Brihn*, 332 F. App'x at 333; *see also* 20 C.F.R. § 404.1529(c); SSR 96-7p, 1996 WL 374186 at *3.

Here, the ALJ noted that Mr. Biangamano suffered from "a mild form of degenerative disc disease," but was "able to engage in a wide range of exertional activities nonetheless." (R. at 26.) The ALJ also noted that both Mr. Biangamano's therapist and physicians advised him to enter work hardening and stay as active as possible, which indicated, "that he would likely be capable of doing work beyond just the sedentary level, despite his back impairment...[this], coupled with the exceptionally ordinary objective and clinical findings... severely diminish[es] the credibility of the claimant's allegations with regard to the limiting effects of his impairments." (R. at 26-27.)

The ALJ appropriately based his credibility determination on the entirety of the record, and sufficiently explained why he discredited Mr. Biangamano's statements regarding his pain. In evaluating the recommendations of Mr. Biangamano's doctor and therapists, the ALJ sufficiently explained why he determined that Mr. Biangamano's statements lacked credibility. Therefore, Mr. Biangamano's claim that the ALJ erred by failing to sufficiently explain why participation in the work hardening program diminished Mr. Biangamano's credibility fails.

## III. Appropriateness of Hypothetical Questions

Finally, Mr. Biangamano contends that the ALJ's hypothetical question to the VE was in error because it was vague and not presented in work-related terms. Mr. Biangamano first argues that the ALJ did not provide specific limitations in his hypothetical to the ALJ. He contends that the ALJ's hypothetical did not present a specific limitation to the VE, but rather identified a problem in the Plaintiff's concentration with several qualifiers that were not specifically defined. (Mot. at 16.) The Commissioner disagrees and responds that the ALJ sufficiently explained the limitations by describing the difference in the level of concentration required for sweeping a floor compared to the level of concentration required to be a micro-surgeon. (Resp. at 15.)

An ALJ's hypothetical question is proper when it reflects a claimant's impairments to the extent that the ALJ found them supported by evidence in the record. *Ehrhart v. Sec'y of HHS*, 969 F.2d 534, 540 (7th Cir. 1992). While the most effective way to ensure that the VE is informed of the claimant's limitations is to include all of them directly in the hypothetical, an ALJ's hypothetical question does not need to incorporate every aspect of the claimant's impairments so long as the record supports the conclusion that the VE considered the medical reports and documents. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010).

In this case, the ALJ asked the VE to respond to a series of hypothetical questions. (R. at 73.) First, the ALJ posed:

> Assume the claimant to be a younger individual with a 12th grade education, with past relevant work similar to Mr. Biangamano's. Assume further that he can lift and carry no more than 20 pounds occasionally, and 10 pounds frequently. He can be on his feet standing and walking no more than two hours in an eight-hour workday. He should not be exposed to working at heights or climbing ladders. He can only occasionally bend. (R. at 68-69.)

The ALJ then revised his hypothetical and asked the VE whether the hypothetical individual would be able to:

> Perform the suggested jobs if he were to further assume that, taking into consideration the postural and environmental restrictions mentioned in the previous hypothetical, as well as the individual's ability to maintain attention and concentration; the individual could lift and carry no more than 15 pounds occasionally; he could stand and walk no more than 20 to 30 minutes at a time; can sit no more than 30 minutes at a time and his ability to push and pull would be to the extent that he could lift and carry. (R. at 70-71.)

The ALJ then again restated his hypothetical, explaining that the specific restrictions provided were in terms of the hypothetical individual's inability to maintain attention and concentration for extended periods of time. (R. at 73.) The ALJ then posed a fourth hypothetical of whether the person would be able to work if he was off-task more than ten minutes an hour. (R. at 77.) Finally, the ALJ posed a fifth hypothetical: everything else taken into consideration except for the ten minutes off-task, if the person had to lie down for an hour out

of that work day, whether the person would be able to perform any of the three cited jobs. *Id.* Additionally, the ALJ clarified his hypotheticals regarding concentration and attention by comparing a floor sweeper and a micro-surgeon, stating:

> For example, if you are sweeping the floor, you could be sweeping and watching something, you could talk to someone at the same time as opposed to [a] micro surgeon. So that's what he would have to consider. I don't know enough about the jobs to know exactly what type of detailed concentration ongoing is required or the nature of the concentration. (R. at 74.)

Here, the ALJ properly reflected Mr. Biangamano's impairments to the extent that he found them supported by evidence in the record. The ALJ sufficiently stated a specific hypothetical by clarifying his limitations as he presented each hypothetical to the VE. Therefore, Mr. Biangamano's argument that the ALJ's decision should be reversed fails.

Next, Mr. Biangamano contends that the ALJ failed to clarify with specificity what level of work-related limitation corresponded to a "mild to moderate inability to [maintain] attention and concentration for extended periods due to pain and discomfort fluctuating between the level of four to five on a scale of one to ten, where ten is the greatest degree of severity." (Mot. at 18.) The Commissioner disagrees and contends that the ALJ articulated the difference in concentration in work-related terms by his comparison of the floor sweeper to a micro-surgeon. (Resp. at 15.) Further, the Commissioner argues that the

VE acknowledged that he "understood what the ALJ meant and had applied that limitation in identifying performable jobs." *Id.*

An ALJ must express a claimant's limitations in work-related terms. SSR 96-8p, 1996 WL 374184 at *1. Here again, the ALJ compared the difference in concentration required to be a floor sweeper to a micro surgeon. (R. at 74.) He further explained, "I don't know enough about the jobs to know exactly what type of detailed concentration...is required. Apparently, there is a difference even in these jobs...in terms of the assembly, sorter, and visual inspector jobs as opposed to the cashier jobs." *Id.* In making the comparison of a floor sweeper and micro surgeon, the ALJ expressed the concentration limitation in work-related terms. Further, the ALJ explained that each job recommended by the VE would have different concentration requirements. Because the ALJ sufficiently explained the hypothetical, Mr. Biangamano's argument that the ALJ failed to define the hypothetical to the VE in work-related terms fails.

### CONCLUSION

For the reasons set forth above, the Court denies Mr. Biangamano's Motion for Summary Judgment. The Commissioner's decision is affirmed.


Date: December 14, 2011          ENTERED:

                                 _____
                                 MAGISTRATE JUDGE ARLANDER KEYS
                                 UNITED STATES DISTRICT COURT